Charles TART, Plaintiff,

v.

ELEMENTIS PIGMENTS
INC., Defendant.

No. 99–CV–0388–MJR.

United States District Court,
S.D. Illinois.

June 21, 2001.

Edward J. Szewczyk, Jr., Callis, Papa, Granite City, Eric E. Vickers, Vickers & Associates, St. Louis, MO, Julie R. Griffeth, Kaufhold & Associates, Belleville, IL, for Plaintiff.

Stephen D. Smith, Timothy J. Sarsfield, St. Louis, Carrie L. Schierer, Armstrong Teasdale LLP, St. Louis, Michael J. Ossip, Morgan, Lewis, Philadelphia, PA, for Defendant.

### ORDER

REAGAN, District Judge.

### I. *Introduction*

On June 3, 1999, Charles Tart filed a two-count complaint against his employer, Elementis Pigments, Inc. ("Elementis"). Count I alleged that Elementis had discriminated against him in violation of the American Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, by not accommodating his disability. Count II alleged that Elementis failed to recall him to work in retaliation for his claim for workers' compensation in violation of Illinois law.

On April 9, 2001, a jury returned a verdict in favor of Tart on both counts. Under Count I (the ADA claim), the jury awarded Tart $500,000 in compensatory damages and $1,500,000 in punitive damages. Under Count II (failure to recall in retaliation for his claim for workers' compensation), the jury assessed $500,000 for pain, suffering, and mental anguish, $30,000 for past loss of earnings, $175,000 for future loss of earnings, and $750,000 in punitive damages (for a total of $1,455,000).

However, several issues remain for the Court to decide.

### II. *Statutory Cap on Damages under the ADA*

■ The ADA imposes a mandatory cap on compensatory and punitive damages depending upon the number of employees the defendant employs. 42 U.S.C. § 1981a(b)(3). In its answer to Tart's post-verdict interrogatory, Elementis states that it has employed less than 480 employees worldwide during each week of each calendar year since January 6, 1996. Under the ADA, "the sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed $200,000 in the case of a defendant who has more than 200 and fewer than 501 employees in each of 20 or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 1981a(b)(3)(C).

Tart concedes a $200,000 cap applies but argues the award (as reduced to meet the $200,000 cap) should represent $200,000 in compensatory damages and $0 in punitive

damages. To the contrary, Elementis argues that the cap should apply in a direct ratio to the jury's original award of compensatory and punitive damages. Since the jury's original award was a one to three ratio of compensatory damages versus punitive damages ($50,000 in compensatory and $1,500,000 in punitive damages), Elementis maintains that Tart should receive $50,000 in compensatory and $150,000 in punitive damages under the cap. The Court disagrees. As the Seventh Circuit has confirmed, the ADA "contains no command as to how a district court is to conform a jury award to the statutory cap." *Jonasson v. Lutheran Child and Family Services*, 115 F.3d 436, 441 (7th Cir.1997).

By the jury's award of $500,000 in compensatory damages under Count I, the Court finds the jury clearly believed Tart's compensatory damages under Count I were significant. Moreover, punitive damages are looked upon with a jaundiced eye in contrast to compensatory damages. If the Court accepted Elementis' suggested one to three ratio, Tart would receive $50,000 in compensatory and $150,000 in punitive damages. Assuming the punitive award is reversed, Tart would be left with $50,000 compensatory damages in a case where he proved $500,000 in compensatory loss. Worse yet, Elementis, whose conduct in the jury's view mandated a punitive verdict of $1,500,000, would benefit from the egregious nature of its action because the ratio of punitive damages exhausts

75% of the cap. This would leave Tart with only 10% ($50,000 of $500,000) of the original compensatory award and 0% of the punitive award. Therefore, the Court REDUCES THE TOTAL AWARD UNDER COUNT I TO $200,000 pursuant to the statutory cap, all of which represents compensatory damages. Conforming the jury's award to the statutory cap does not affect the taxation of the damage award, which is taxable whether designated as compensatory or punitive.

■■■ Although the Court imposes the statutory cap as to the compensatory damages awarded under Count I pursuant to 42 U.S.C. § 1981a, back pay and front pay[1] are not subject to this cap. Therefore, this Court must determine the amount of back pay to which Tart is entitled, whether Tart should be reinstated or receive front pay, attorneys' fees, and any other equitable relief warranted.[2]

### III. *Back pay*

### A. Count I—ADA

The parties stipulate that Tart is entitled to an award of back pay under Count I. Tart argues that he is entitled to back pay from October 28, 1997, the first day Elementis refused to accommodate his disability, to May 1, 2001, a post-verdict date that Tart does not explain. Tart also argues that $6000 per year should be added to his hourly wages for the value of his health insurance. All in all, Tart seeks $130,090 in back pay under Count I. How-

---

1. See *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 121 S.Ct. 1946, 1949–52, 150 L.Ed.2d 62 (2001).

2. Elementis also argues that the compensatory awards under each count are duplicative and should be offset. Elementis provides no support for this position. Regardless, a review of the jury instructions in this case reveals that the jury was not instructed to award damages for any claim or element of a

claim which was duplicative of the other. In fact, the elements of each claim described in the jury instructions (discrimination based upon a disability versus retaliation for filing a workers' compensation claim) were markedly different and did not overlap. Therefore, the Court finds that the compensatory damages under each count were awarded for different claims involving different conduct. Accordingly, the awards are not duplicative, and an offset is not warranted.

ever, this conflicts with the opinion of Dr. Leroy J. Grossman, Tart's economist. In his report, Dr. Grossman opines that Tart is entitled to $96,405 in back pay. Although Dr. Grossman provides no explanation for this figure, it appears that he has excluded approximately six months of wages.

■ Elementis agrees with Dr. Grossman's presumed assumption that wages needed to be excluded for periods of time during which Tart otherwise would not have been working. However, Elementis argues that more time should be excluded. The Court agrees. An employee is not entitled to back pay for periods of time that he otherwise would not have been working even if the unlawful discrimination had not occurred. *Flowers v. Komatsu Mining Systems, Inc.*, 165 F.3d 554, 557 (7th Cir.1999).

First, the evidence shows that from October 29, 1997 to January 8, 1998, Tart was totally disabled and industrially unemployable. Therefore, this time frame must be excluded.

■ Second, the time period the jury used to determine the back pay award under Count II must be excluded in order to avoid a duplicative award. Tart can "only recover back pay once for a single time period no matter how many or few of Elementis' unlawful acts caused the Tart's back pay loss." *Emmel v. Coca–Cola Bottling Co. of Chicago, Inc.*, 904 F.Supp. 723, 750 (N.D.Ill.1995), *aff'd*, 95 F.3d 627 (7th Cir.1996). There can be no duplication of any back pay award. *Id.* The jury assessed Tart's back pay under Count II using a time period beginning on June 1, 2000, the first day Tart should have been recalled to work, to the date of the verdict. This time must be excluded when determining the back pay award under Count I. Therefore, the time period for determining back pay under Count I ends on May 31, 2000.

Next, the evidence shows that the Painters' Union Local 1850, of which Tart was a member, engaged in a strike from November 11, 1999 to May 31, 2000. This time period also must be excluded.

Taking into consideration each of the applicable time period exclusions, Tart is entitled to back pay from January 9, 1998 to November 10, 1999. Given the evidence regarding his salary during 1998 and 1999, Tart would have earned $34,661.84 during this time period (1/9/98 to 10/12/98 at $15.01 per hour plus 10/13/98 to 11/10/99 at $15.31 per hour).

Elementis also argues that this figure is subject to additional reductions for (1)permanent partial disability payments that were offered by Elementis but rejected by Tart; (2)actual interim earnings; and (3) imputed earnings as a result of Tart's failure to take advantage of vocational retraining or positions paying $19,600 per year as alleged by Elementis' vocational rehabilitation expert. The Court disagrees.

■ A worker has a permanent partial disability when the injury received leaves the worker permanently partially incapacitated from pursuing his usual and customary employment and is reasonably certain to permanently prevent the worker from earning as much as the worker would have earned absent the injury. *DiFoggio v. Retirement Bd. of County Employees Annuity and Ben. Fund of Cook County*, 156 Ill.2d 377, 189 Ill.Dec. 753, 620 N.E.2d 1070, 1071 (1993). Under this definition, benefits for a permanent partial disability are to compensate for future wage loss or earning potential. Therefore, such benefits do not offset any back pay award.

With regard to Tart's actual interim earnings, the evidence shows that Tart only had interim earnings during the period from January 1, 2000 to January 7, 2001, which is during the back pay period

applicable under Count II. Therefore, this issue will be discussed when the Court addresses the back pay award under Count II, *infra.* No deduction for actual interim earnings is applicable for this back pay period under Count I.

■ As to Tart's imputed interim earnings, the Court finds that Tart was not required to seek out other employment. First, Tart was technically employed by Elementis during this time frame, although he was not working or drawing a paycheck. Additionally, no positions or jobs within Tart's physical limitations were suggested or offered by Elementis' vocational expert at trial. Therefore, no deduction is warranted.

This brings the Court to the issue of reimbursement for the value of health insurance. The evidence shows that Elementis provided Tart with medical insurance for the first year he was on medical leave from October 28, 1997 to October 28, 1998. In addition, Tart would not have received medical insurance during the strike. Therefore, Tart is entitled to reimbursement for the value of his health insurance from October 29, 1998 to November 10, 1999, or $6,213.72 ($6000 for October 29, 1998 to October 28, 1999 plus $16.44 per day for October 29, 1999 to October 31, 1999).

Accordingly, the Court AWARDS $40,875.56 in back pay under Count I.

### B. Count II—Workers' Compensation Retaliation

■ The jury awarded Tart $30,000 in back pay for his claim for worker's compensation retaliation. Elementis argues that this award is excessive given that the evidence at trial provided for a maximum of $28,089.66 in back pay. Elementis also argues that a deduction should be made for Tart's actual interim earnings of $1,825.32. The Court disagrees.

Although Tart's hourly wages for this time frame minus the necessary deduction of interim earnings supports only a lower award, back pay may be awarded to compensate for the value of benefits. Tart's health insurance was $6000 per year. Adding this benefit to the amount of Tart's wages during this time frame minus his actual interim earnings results in a figure in excess of $30,000 ($28,089.66 minus $1,825.32 = $26,264.34 plus $6,000 = $32,264.34). Therefore, the award will not be reduced.

### IV. *Pre-judgment Interest*

■ The parties agree that Tart is entitled to pre-judgment interest on back pay awarded under Count I, but disagree about the rate. Elementis argues that the Court should limit pre-judgment interest to the federal post-judgment rate of 4.04%. The Court disagrees. The Seventh Circuit has specifically held that "district judges should use the prime rate." *Partington v. Broyhill Furniture Industries, Inc.,* 999 F.2d 269, 274 (7th Cir.1993), *citing In re Oil Spill by the Amoco Cadiz,* 954 F.2d 1279, 1332 (7th Cir.1992). The parties agree that the applicable prime rate is 7.5%. Accordingly, the Court AWARDS pre-judgment interest on Tart's back pay award under Count I at a rate of 7.5% from January 9, 1998 until judgment is entered, with post-judgment interest accruing thereafter.

■ Because the Illinois Interest Act, 815 ILCS § 205/2, does not provide for pre-judgment interest in tort cases, Tart is not entitled to pre-judgment interest on damages under Count II. *Westchester Fire Ins. Co. v. General Star Indemnity Co.,* 183 F.3d 578, 585 (7th Cir.1999).

### V. *Reinstatement v. Front Pay*

■ Although this Court may order Elementis to recall Tart to his position and accommodate his disabilities, reinstate-

ment is inappropriate when there is substantial animosity between the parties and the relationship is unlikely to improve. *Pollard*, 532 U.S. 843, 121 S.Ct. at 1950, *citing Brooks v. Woodline Motor Freight, Inc.*, 852 F.2d 1061, 1066 (8th Cir.1988). In this case, the evidence shows that continuing animosity and hostility remain between the parties. It is the Court's opinion that this relationship is unlikely to improve.

Additionally, the evidence shows that Tart's job as an NYD operator no longer exists and/or that Tart could not perform the job given the new duties required since he last worked. Tart disagrees and has filed the affidavit of Travis Coleman, an NYD operator for the past 12 years, in support of his argument that he could perform the job with accommodation. However, the Court defers to the testimony of Brian Burns, Elementis' Industrial Relations Supervisor, who testified live at trial. Mr. Burns testified that on July 2, 2000, Elementis issued a new job bid for a synthetics dry end operator which encompasses the duties of the NYD operator but also requires many other duties, as the new position involves the operation of two dryers instead of one. This has doubled the work load.

Moreover, the synthetic dryer end operator position requires intense manual activities that Tart is restricted from doing. Such activities, as described by Mr. Burns, include: (1) manually moving the transfer hose (similar in size to a fire hose) off the dryer and moving it from location to location to transfer the product instead of having conveyors take the product to different storage bins like an NYD operator; (2) taking several different product sample collections twice each per shift—some of which weigh up to 25 pounds; (3) climbing lengthy flights of stairs; (4) cleaning out contaminant storage hoppers with a forklift twice per shift; (5) performing the "very manual" job of operating 10 foot wide filter press plates and scraping the excess product off onto a conveyor belt—since there are 75 on one machine, this may have to be done once or twice per shift; (6) washing out the product tanks with a fire hose; and (7) changing dust collection bags from the dust collection system located outside of the building up a 50–foot ladder using a manual hoist to raise the bag. Since Tart is restricted from climbing stairs, lifting more than ten to fifteen pounds, bending, twisting, stooping, and shoveling, Elementis could not modify the synthetics dry end operator position to accommodate Tart's disabilities.

Although the Court acknowledges his genuine interest in returning to work, ordering Tart reinstated would set him up to fail. Therefore, the Court declines to order Tart reinstated.

■ Accordingly, an award of front pay is warranted. Front pay is simply compensation for the post-judgment effects of past discrimination and designed to make the plaintiff whole. *Pollard*, 532 U.S. 843, 121 S.Ct. at 1950, *citing Shore v. Federal Express Corp.*, 777 F.2d 1155, 1158–59 (6th Cir.1985).

The parties have briefed the issue of front pay, and Tart has supplied the Court with the report of economist, Dr. Grossman. However, the parties have stipulated that if the Court declined to reinstate Tart and that an award of front pay was warranted, the deposition of Dr. Grossman could be taken. Since the Court has now decided that Tart will not be reinstated, the parties should proceed with deposing Dr. Grossman if they so desire. Tart shall produce Dr. Grossman for deposition *by July 27, 2001.* A copy of his deposition should be filed with the Court thereafter, so the Court may determine the amount of the front pay award.

## VI. *Post–Judgment Interest*

Under 28 U.S.C. § 1961, a prevailing party in civil litigation is entitled to interest on a money judgment from the date of entry of the judgment. *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1211 (7th Cir.1989). Post-judgment interest rates have traditionally been based upon the current United States Treasury Bill ("T-bill") rate. However, Congress recently passed legislation establishing a new interest rate index for U.S. Government Securities for Treasury constant maturities. Under this index, the interest rate for the week of April 9, 2001 (the week of the jury verdict) was 4.07%. Therefore, the Court AWARDS post-judgment interest on all money damages awarded under both Counts I and II at a rate of 4.07% from the date judgment is entered until paid.

## VII. *Attorneys' Fees under the ADA*

Under the ADA, it is within the Court's discretion to award attorneys' fees to the prevailing party. 42 U.S.C. § 12205; *Adkins v. Briggs & Stratton Corp.*, 159 F.3d 306, 307 (7th Cir.1998).

### A. Kaufhold & Associates

 Tart hired Kaufhold & Associates to represent him in early 2000.[3] Kaufhold & Associates represented Tart throughout the entire discovery and dispositive motion phases of the case. They were granted leave to withdraw less than two months before trial. As such, Kaufhold & Associates, primarily through the work of former associate Julie R. Griffeth, worked many hours on Tart's case and have filed a motion for attorneys' fees seeking fees and costs (Docs.133, 152). Elementis argues that Kaufhold & Associates have no standing to do so, because they have withdrawn from the case. The Court finds this argument moot, since Tart was given leave by

this Court to adopt Kaufhold & Associates' motion for fees and expenses (Doc. 150). The Court further finds that because Kaufhold & Associates represented Tart through the entire pretrial discovery and dispositive motion phases of the case, they are entitled to their share of attorneys' fees.

 Attorneys' fees are traditionally calculated by multiplying each attorney's "reasonable hourly rate" by the "reasonable hours expended" on the case to determine the presumed "reasonable fee." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

Attorneys Kevin C. Kaufhold and Julie R. Griffeth and two law clerks worked on Tart's case. Kaufhold & Associates, which bills Kaufhold at $150 per hour, Griffeth at $125 per hour, and the law clerks at $50 per hour, contend that the rates are more than reasonable and customary for both the law firm and the geographical area. Based upon the bills they provided to the Court in support of their motion for fees and costs, Kaufhold & Associates seek fees for 334 hours of work, or $35,933.75 in fees plus $4,653.43 in costs.

 Although Elementis concedes the rates for Kaufhold and the law clerks, it disputes the hourly rate sought for Griffeth, a 1999 law school graduate. Elementis argues that during 2000, its counsel billed 1999 graduates at $100 per hour. Accordingly, Elementis argues that the hourly rate used to calculate the fees generated by Griffeth should be $100 per hour. The Court agrees and will calculate Griffeth's fees at $100 per hour.

Elementis also contends that the number of hours expended by Kaufhold & Associates was excessive and that certain costs were inappropriate. Although the

---

**3.** Tart hired Eric E. Vickers before Kaufhold & Associates, but Mr. Vickers' application for admission to practice in this District *pro hac vice* was denied.

Court does not seek to become an auditor of attorneys' bills, it will address each of Elementis' contentions about Kaufhold & Associates' bill.

First, Elementis argues that nine hours expended by law clerks copying and organizing files obtained by Tart is excessive and should be reduced to one hour. Elementis argues that the time is excessive and that generally, plaintiffs in employment discrimination cases have little or nothing to produce by way of documentation. The Court agrees.

Second, Elementis seeks a reduction of fees for three of Griffeth's billing entries regarding the issue of Tart's unemployment. As this does not appear to relate to the merits of the case, these charges will be disallowed.

Elementis next contests two hours Griffeth spent reviewing orders from Magistrate Judge Proud. The Court agrees that this appears excessive and reduces the charge by an hour.

Elementis also disagrees with an hour charged by a law clerk in preparing a reply to its affirmative defenses and asks that the time be reduced to 15 minutes. The Court disagrees. A responsive pleading is a very serious matter deserving of adequate time to prepare. Therefore, the charge will not be reduced.

Next, Elementis argues that time Griffeth spent preparing letters to two doctors who were never identified as expert witnesses should be discounted. The Court again disagrees. Although letters were written to two doctors who ultimately were not used to prosecute Tart's claim, the letters arose out of necessary preparation of the case and will not be discounted.

Elementis also takes issue with Griffeth's time spent reviewing a medical lien. The Court agrees. Since Tart was not seeking damages for a physical injury, the review of a medical lien would not naturally arise out of Kaufhold & Associates' representation. Therefore, this charge will be discounted.

Elementis next argues that $998.20 in expert fees for Timothy Kaver, who did not testify at trial, should not be allowed. The Court agrees. Fees for expert witnesses are not allowable if the witness does not appear in court. *Jones v. Unisys Corp.*, 54 F.3d 624, 633 (10th Cir. 1995). Therefore, his fees will be deducted from Kaufhold & Associates' costs.

The bulk of fees Elementis asks the Court to discount are those arising from the filing of Tart's motion for summary judgment. Elementis argues that plaintiffs rarely, if ever, move for summary judgment in discrimination cases, and there was no reason for Kaufhold & Associates to do so in this case. Therefore, Elementis asks that 47.35 hours spent in preparing, filing, and arguing Tart's motion for summary judgment should be stricken from Kaufhold & Associates' bill. The Court disagrees. Tart was entitled to move for summary judgment if he believed that there were no genuine issues of material fact and that he was entitled to judgment as a matter of law. The law imposes no restriction as to who may or may not seek such relief. Therefore, the fees will not be discounted.

Elementis also seeks a reduction in fees and costs associated with Kaufhold & Associates' withdrawal from the case and on post-withdrawal matters. The Court agrees. Attorneys' fees should be awarded for work done to further their client's interests, not their own. Therefore, $2,087.50 in attorneys' fees for 18.50 hours of post-withdrawal work and $553.37 in costs for post-withdrawal copies, parking, and postage will be disallowed.

Elementis also asks the Court to strike a $75.70 charge to Iron Mountain

Health. Elementis states that it is not familiar with how this item could be related to the case. Kaufhold & Associates have not responded to this contention. Therefore, the Court will strike the cost from the bill.

 Given these deductions and the discount in Griffeth's rate, Kaufhold & Associates fees total $26,364.30. However, Elementis seeks a one-half reduction of Kaufhold & Associates' total fees for time spent working on the state law claim (Count II) under which they are not entitled to an award of attorneys' fees. The Court agrees that a reduction must be made but disagrees that it should simply cut the bill in half. For instance, when Tart's attorneys were required to appear in Court, the Court is certain that the time was not doubled merely because they were also there with regard to Count II. However, it is impossible to glean the exact amount of time spent on Count I versus time on Count II with specificity. Therefore, the Court believes a general reduction of Kaufhold & Associates' fees by 20% to account for their work on Count II is fair and reasonable.

Accordingly, the Court GRANTS Kaufhold & Associates' motion for attorneys' fees and costs (Doc. 133) and AWARDS Kaufhold & Associates attorneys' fees in the amount of $21,890.00 and costs in the amount of $3,026.16 under Count I.

## B. Edward J. Szewczyk, Jr.

Edward J. Szewczyk, Jr. of Callis, Papa, Jackstadt & Halloran, P.C. entered his appearance as Tart's attorney ten days before the trial began. Szewczyk seeks fees at a rate of $275 per hour and produces a bill which shows he expended 229.1 hours to prepare and try the case. However, he seeks a 50% upward adjustment given the time constraints under which he prepared the case, his work at nights and on weekends to the exclusion of all other work, and the complexity of the case. He also seeks $3,318 in law clerk fees and $3,042.99 in costs.

Elementis concedes the number of hours Szewczyk billed and concedes his law clerk's fees. However, Elementis disputes Szewczyk's hourly rate and costs and requests that the Court reduce his fees by 50% to account for his work on the state law claim (Count II).

 The Court first addresses Szewczyk's hourly rate. Elementis contends that since Szewczyk and Kaufhold's levels of experience are virtually identical, Szewczyk's rate should be reduced to $150 per hour. The Court disagrees. Although the Court is unaware of the rate at which defense counsel were billed, Tart's submission of the *St. Louis Business Journal Book of Lists*, 2001 Edition, shows that their firm's hourly fees can reach up to $335 per hour. Elementis does not contest this. Additionally, the Court finds, as Szewczyk pointed out in support of his argument for an upward adjustment, that he had only ten days in which to prepare for the trial of a very complicated case which required many hours at nights and on weekends to the exclusion of all other work. Therefore, the Court finds that $275 per hour for Szewczyk's work is a reasonable hourly rate. However, the Court declines to award Szewczyk an upward adjustment of fees.

 The Court next evaluates Szewczyk's costs. Elementis asks the Court to discount expert witness fees for Dr. Walter Heidke and Dr. Leroy Grossman because they were not identified as expert witnesses. The Court disagrees. Although Dr. Heidke was not retained by Tart as an expert witness, he was disclosed as a non-retained expert chiropractor who treated Tart. The Court finds his testimony was material, relevant, and reasonably necessary to the case. *See Rank v. Bal-*

*shy,* 590 F.Supp. 787, 801 (M.D.Pa.1984). As such, the cost of his fees is appropriate and taxable against Elementis.

It is premature, however, to determine if Dr. Grossman's fees are appropriate. Dr. Grossman has been retained as an expert economist since the trial of this case to provide evidence in support of Tart's request for Court-decided equitable relief such as back and front pay. His testimony has not been provided to the Court Therefore, the Court is unable to determine if his testimony is material, relevant, and reasonably necessary to the case so as to warrant the payment of his fees. This issue will be addressed if and when Dr. Grossman is deposed and his testimony is provided to the Court.

Finally, Elementis seeks a one-half reduction of Szewczyk's fees for time spent working on the state law claim under which he is not entitled to an award of attorneys' fees. For the reasons stated above, the Court reduces Szewczyk's fees by 20% to account for his work on Count II.

Accordingly, the Court AWARDS Edward J. Szewczyk, Jr. attorneys' fees in the amount of $66,320.50 and costs in the amount of $2,142.99 under Count I.

**IT IS SO ORDERED.**